FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

02 AUG 27  PM 3: 32

U.S. DISTRICT COURT
N.D. OF ALABAMA

|  |  |  |
|---|---|---|
| CUMBERLAND CASUALTY & | ) | |
| SURETY COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 00-JEO-3565-S |
| | ) | |
| COLONIAL BANK; DERRELL | ) | |
| CHAMBLEE; C.A.C. LEASING, INC.; | ) | |
| BLACK CREEK LAND & MINERAL, INC.; | ) | |
| WALKER LAND & MINERAL, INC.; | ) | |
| LAGUNA RESOURCES, INC.; and | ) | |
| JEFFERSON SCREENING, INC., | ) | |
| | ) | |
| Defendants. | ) | |

# ENTERED

AUG 2 7 2002

## <u>MEMORANDUM OPINION</u>

Cumberland Casualty & Surety Company (hereinafter "Cumberland" or "the plaintiff")

filed the above-captioned action seeking a declaratory judgment in its favor and against

defendants Colonial Bank (hereinafter "Colonial"), Derrell Chamblee (hereinafter "Chamblee"),

C.A.C. Leasing, Inc. (hereinafter "CAC"), Black Creek Land & Mineral, Inc. (hereinafter "Black

Creek"), Walker Land & Mineral, Inc. (hereinafter "Walker Land"), Laguna Resources, Inc.

(hereinafter "Laguna"), and Jefferson Screening, Inc. (hereinafter "Jefferson Screening"). (Doc.

1). It is now before the court on "Cumberland's Motion for Summary Judgment" (doc. 16),

which is opposed by defendant Colonial. Upon consideration of the record, the submissions of

the parties, and the relevant law, the court is of the opinion that plaintiff's motion for summary

judgment is due to be denied.

## I. PROCEDURAL HISTORY

Cumberland filed this action for declaratory judgment and other relief on December 12,

2000. (Doc. 1). It requests, among other things, that this court (1) find and declare that, pursuant to its right of equitable subrogation, it is entitled to any and all proceeds of the related state court litigation in the Circuit Court of Walker County; (2) find and declare that its rights are superior to those of defendant Colonial; and (3) grant it an injunction, requiring the defendants herein to hold any and all funds paid in judgment or settlement of the related state court litigation in escrow pending the outcome of this litigation. (*Id*. at 6).

Cumberland filed the present motion for summary judgment on September 17, 2001. (Doc. 16). The court conducted a hearing on the motion on April 30, 2002. The parties have submitted supplemental briefs and evidence on the motion. (Doc. 26-29). The parties have consented to the jurisdiction of the undersigned magistrate judge for disposition of the case.

At the hearing on the motion, Colonial objected to the plaintiff filing additional evidence with its supplemental brief. The usual rule is that the moving party cannot submit additional evidence with a reply brief or after the opposing party's opportunity to respond has passed, absent permission of the court. The reason for this rule is obvious -- the non-moving party must be allowed at least "a reasonable and meaningful opportunity to challenge a motion for summary judgment." *Burns v. Gadsden State Community College*, 908 F.2d 1512, 1516 (11th Cir. 1990) (citing, *inter alia*, *Winbourne v. Eastern Air Lines, Inc.*, 632 F.2d 219 (2d Cir. 1980) ("purpose of Rule 56(c) is to permit nonmoving party a meaningful opportunity to challenge motion for summary judgment")). In *Burns*, the Eleventh Circuit Court of Appeals stated:

> Recognizing the importance of giving the nonmovant a meaningful opportunity to respond to a motion for summary judgment, this circuit has strictly enforced the requirement of a 10-day advance notice that the court will take a motion for summary judgment under advisement as of a certain date. . . . The reasons for such a requirement are premised on the fact that disposition of a case on summary

judgment grounds represents a final adjudication on the merits.  It forecloses subsequent litigation on the matter; it is accordingly important that proper notice be given so as to insure "opportunity to present every factual and legal argument available."

*Id.* (internal quotations and citations omitted).

When faced with additional evidence submitted by the moving party after the time set for the non-moving party to file all its evidence in opposition to the motion, a court has two options: "it [can] strike the [evidence] or grant . . . the nonmoving party the opportunity to respond to it." *Cia. Petrolera Caribe, Inc. v. Arco Caribbean, Inc.*, 754 F.2d 404, 410 (1st Cir. 1985); *see Beaird v. Seagate Technology, Inc.*, 145 F.3d 1159, 1164 (10th Cir. 1998) ("Appellants contend that the district court had no 'permissible choice' but to allow a surreply once it had accepted the materials in Seagate's reply.  That contention is incorrect.  Having accepted the reply brief, the district court in fact had two permissible courses of action.  It could either have permitted a surreply or, in granting summary judgment for the movant, it could have refrained from relying on any new material contained in the reply brief.").

This court chooses not to strike the evidence.  Colonial has had an adequate opportunity to review and comment on the additional submissions.  Additionally, the materials assist both parties by providing a more complete record for review.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is to be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the declarations, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  FED. R. CIV. P. 56(c);  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.

3

Ct. 2548, 91 L. Ed. 2d 265 (1986). The party asking for summary judgment "bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial. Only when that burden has been met does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S. Ct. 1598, 1608, 26 L. Ed. 2d 142 (1970).

The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of his case on which he bears the ultimate burden of proof. *Celotex,* 477 U.S. at 322-23; *see* FED. R. CIV. P. 56(a) and (b). Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex*, 477 U.S. at 324. The nonmoving party need not present evidence in a form necessary for admission at trial; however, the movant may not merely rest on the pleadings. *Id.*

After a motion has been responded to, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Rule 56(c) mandates the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex,* 477 U.S. at 322.

The substantive law will identify which facts are material and which are irrelevant.

4

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. A judge's guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 259; *see Bill Johnson's Restaurants, Inc. v. NLRB*, 461 U.S. 731, 745 n.11, 103 S. Ct. 2161, 76 L. Ed. 2d 277 (1983). *Allen v. Tyson Foods, Inc.,* 121 F.3d 642, 643 (11th Cir. 1997). However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matusushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).

If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Anderson*, 477 U.S. at 249 (citations omitted); *accord Spence v. Zimmerman*, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. *Anderson,* 477 U.S. at 254; *Cottle v. Storer Communication, Inc.,* 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts is the function of the jury, and therefore the evidence of the nonmovant is to be believed and all justifiable inferences are to be drawn in his favor. *Anderson*, 477 U.S. at 255. The nonmovant need not be given the benefit of every inference but only of every reasonable inference. *Brown v.*

*City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11ᵗʰ Cir. 1988). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen*, 121 F.3d at 643.

## III. STATEMENT OF FACTS[1]

In 1996, Colonial began extending credit to the other defendants, including substantial sums of money Chamblee, CAC, Jefferson Screening, and Black Creek for the purpose of financing the acquisition of mining equipment by them. (Doc. 18, Ex. P (First Amended Complaint), Counts 1-6). Jefferson Screening, Black Creek, CAC, and Chamblee executed continuing guarantees of the indebtedness to Colonial. (*Id.*). On January 13, 1999, Colonial filed with the Alabama Secretary of State a UCC-1 Financing Statement, B99-01899, wherein it was granted a perfected first priority security interest in the general intangibles of Laguna and Walker Land, the companies that were involved in the mining operations, as well as in $6,000,000.00 in life insurance proceeds on the life of Chamblee. (Doc. 18, Ex. O). After various modifications to the lines of credit, Laguna, Walker Land, and Chamblee defaulted on the payments at different times between November 15, 1999, and March 16, 2000. (*Id.*).

Cumberland issued nine "State of Alabama Surface Mining Commission Surety Bond[s]" in association with the surface coal mining operations undertaken by Laguna and Walker Land, the principals on the bonds. (Doc. 18, Ex. A-I). The total amount of the bonds, which were

---

[1] The facts set out below are gleaned from the parties' submissions and are viewed in a light most favorable to the non-moving party, the defendants. They are the "'facts' for summary judgment purposes only. They may not be the actual facts. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11ᵗʰ Cir. 1994)." *Underwood v. Life Insurance Co. of Georgia*, 14 F. Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998).

issued with effective dates between October 26, 1998, and May 16, 1999, is $1,198,660.00. (*Id.*).

The money was intended to guarantee the reclamation of the areas disturbed by the mining

operations. The bonds were supported by general indemnity agreements. (Doc. 18, Ex. J). In

the first agreement, executed October 26, 1998, Laguna and Walker Land were the principals. It

was executed by Chamblee individually and as an authorized signatory for Black Creek,

Jefferson Screening, and CAC as indemnitors. (Doc. 1 at ¶ 13; Doc. 12 at ¶ 13; Doc. 18, Ex. J

(Agreement of Indemnity)). The second agreement was executed in December 1998. It again

lists Laguna and Walker Land as principals and Chamblee, Jefferson Screening, CAC, Black

Creek, and Cheryl A. Chamblee as indemnitors. (*Id.* (Cumberland Casualty & Surety Company

Agreement of Indemnity)).[2] Laguna and Walker Land in separate agreements also assigned their

income, profits, royalties, and proceeds from their surface mining operations to Cumberland.

(Doc. 21, Ex. A).

In 1998, Laguna brought an action in the Circuit Court of Walker County against

Jefferson Screening, which, along with Black Creek, brought a third-party action against

Seminole Electrical Cooperative, Inc. ("Seminole"), to recover money owed them premised on

Seminole's failure to pay for coal that was due to be delivered to it. (*Laguna Resources, Inc. v.

Jefferson Screeing, et al.*, Walker County Circuit Court Case No. 98-561). (Doc. 18 at Ex. K).

Although the coal was ultimately sold to other entities, it was sold at a substantial loss. (Doc. 17

at 7).

On February 8, 2000, the Alabama Surface Mining Commission ("ASMC") issued an

_____

[2] The specific date of execution is not stated, but it must be on or after December 14, 1998, because that is the revision date listed in the lower left-hand corner of the document. This is further supported by the attached corporate acknowledgments that were attached to the agreement, which are dated December 16, 1998. (Doc. 18 at Ex. J).

order to show cause directed to Laguna, requiring it to show why its permit should not be suspended or revoked and its performance bond forfeited for failing "to regrade and vegetate approximately 130 acres of mining disturbance and [for] fail[ing] to maintain discharge from impoundments within applicable water quality parameters." (Doc. 18, Ex. L (February 8, 2000 Order to Show Cause)). A similar order was issued concerning Walker Land. It alleged that Walker Land failed to establish "a vegetive cover," resulting in "rills and gullies," and that Walker Land failed to maintain its sediment ponds. (Doc. 18, Ex. L (June 22, 2000 Order to Show Cause)). Laguna did not respond to the order to show cause. A default judgment was entered in the amount of $523,084.00 on April 10, 2000. (*Id.* at 20, Ex. L (April 10, 2000 Default Judgment)). According to Cumberland's brief, it "responded to the demands of the ASMC by entering into a settlement agreement with the ASMC, and Cumberland has incurred costs and expense[s] in complying with the demands of the ASMC." (Doc. 17, p. 7).

Walker Land and Laguna defaulted on their obligations under the bonds and indemnity agreements. (Doc. 1 at ¶ 13; Doc. 12 at ¶ 13; Chamblee Depo. at 69).[3] Laguna, Walker Land, Chamblee, Black Creek, Jefferson Screening, and CAC (the Chamblee defendants) acknowledge they are obligated "pursuant to principles of equitable subrogation, to indemnify Cumberland." (Doc. 1 at ¶ 15; Doc. 12 at ¶ 15).[4] Cumberland brought an action against the Chamblee defendants[5] on December 12, 2000. (*Cumberland Causalty & Surety Company v. Darrell Chamblee, et al.*, Northern District of Alabama Case Number CV 00-J-3564-S ("00-3564")). It

---

[3] The deposition is found at exhibit Q to the plaintiff's evidentiary submission.

[4] They dispute the amount owed, however.

[5] Cheryl Chamblee was also a defendant in that action. She was dismissed at a later time.

was dismissed on January 22, 2002, on the settlement of the defendants in the amount of $800,000.00. (Docket number 29 in "00-3564").

On or about May 3, 2000, Colonial filed a lawsuit in Walker County to recover the outstanding amounts from the Chamblee defendants. (Doc. 18, Ex. P (*Colonial Bank v. Seminole Electric Cooperative, et al.*, Walker County Circuit Court Case No. 00-332). It also sued Seminole.

Colonial was allowed to intervene in the state court action previously initiated by Laguna, seeking to recover the money it was owed. On October 12, 2000, that court entered an order granting Colonial a partial summary judgment and further granting it a judgment against Chamblee and Jefferson, jointly and severally, premised on their defaults on the promissory notes, in the amount of $1,448,426.00, plus 10% in attorneys fees in the amount of $144,842.00; against Chamblee and Jefferson, jointly and severally, in the amount of $64,981.45, plus 10% in attorneys fees in the amount of $6,498.00; against Jefferson, Black Creek, CAC, Laguna, Walker Land, and Chamblee jointly and severally, in the amount of $3,234,040.27, plus 10% in attorneys fees in the amount of $323,303.00; against Jefferson, Black Creek, CAC, and Chamblee, jointly and severally, in the amount of $702,736.17, plus 10% in attorneys fees in the amount of $170,273.00; and, against Jefferson, Black Creek, CAC, and Chamblee, jointly and severally, in the amount of $1,319,238.42, plus 10% in attorneys fees in the amount of $131,923.00. (Doc. 18, Ex. K, Order, pp. 1-2). The court also ordered:

> As to those Defendants in Colonial's Complaint who are also Plaintiffs in this action against Seminole Electric Cooperative, Inc., entry of the foregoing judgments results in the following amounts being owed to Colonial Bank:
>
> 1. By Jefferson Screening, Inc.: $6,769,423.19 plus attorneys fees in the amount of

$676,940.00.

2.     By Black Creek Land & Mineral, Inc.: $5,256,014.86 plus attorneys fees in the amount of $525,600.00

3.     By Laguna Resources, Inc.: $3,234,040.27 plus attorneys fees in the amount of $323,304.00.

        Due to the fact that Jefferson Screening, Black Creek, and Laguna are jointly and severally liable to Colonial Bank on the promissory notes these companies executed, any recovery by Colonial Bank from either Jefferson Screening, Black Creek, or Laguna shall constitute a credit against the obligation of each of the other companies, who are also plaintiffs in this action.

(*Id.* at 3).

        On April 4, 2001, Colonial, seeking to enforce and collect its judgment, obtained a state court order wherein the Walker County Circuit Court Judge stated, among other things, "[t]hat the proceeds of any judgment entered against Seminole have been assigned to Colonial Bank, to the extent necessary to satisfy the judgment entered in this proceeding on October 12, 2000, in favor of Colonial Bank." (Doc. 20, Ex. B, p. 2).  The court further ordered that "[a]ny monetary judgment entered against Seminole in this proceeding is hereby charged with payment of Colonial Bank's judgment . . . subject to the attorney's lien. . . ." (*Id.*).  In June 2001, Laguna, Black Creek, and Jefferson Screening obtained judgments against Seminole totaling $22,196,899.69.  Specifically, Laguna was entitled to $363,690.00; Black Creek was entitled to $43,652.69, and Jefferson Screening was entitled to $21,789,557.00. (Doc. 20, Ex. A).

**IV.  DISCUSSION**

        The issues presented by the parties require this court to determine what entity or entities are entitled to priority in any recovery that any of the Chamblee defendants receive as a consequence of the Seminole litigation.  Cumberland asserts that as the surety of the Surface

10

Mining Reclamation Bonds it issued to Laguna and Walker Land, which were to be indemnified by the Chamblee entities, it is entitled to priority over Colonial in any recovery under a theory of equitable subrogation and by way of assignment. (Doc. 17, p. 8; Doc. 21, pp. 4-5, 8; Doc. 26, p. 5). Colonial asserts that its right to recovery is superior to any claims by Cumberland because, although it is also a judgment creditor, it has taken appropriate actions to execute its judgment and levy on the proceeds of the judgments against Seminole. (Doc. 20, p. 4). Colonial also asserts that it is entitled to priority in the proceeds of the tort judgment obtained by Laguna, Black Creek, and Jefferson Screening in the Circuit Court of Walker County because Cumberland has cited no authority that permits equitable subrogation to be used as a priority interest in tort judgment proceeds. (Doc. 28, p. 1).

### A. Background

Under Alabama law, a permit is required before any person or entity may "engage in surface coal mining operations at a particular location." ALA. CODE § 9-16-82(a). "After a surface coal mining and reclamation permit application has been approved but before such a permit is issued, the applicant shall file . . . a bond for performance . . . ." ALA. CODE § 9-16-89(a). The requirements for the bond are specified in ALABAMA CODE § 9-16-89(a). That section requires, among other things, a bond payable to the State of Alabama or cash or negotiable instruments in lieu of a corporate surety. *Id.* If the person or entity does not meet the obligations under the permit, the ASMC may request that the Alabama Attorney General bring a civil action for relief or for civil penalties. ALA. CODE §§ 9-16-93(f) & 94(d).

### B. Equitable Subrogation

It is undisputed that (1) Laguna and Walker Land obtained the necessary bonds from

11

Cumberland to perform their mining operations (doc. 18, ex. A-I); (2) coal was mined and was to be sold to Seminole (doc. 18, ex. Q, pp. 192-93); (3) Laguna and Walker Land defaulted on their obligations to the ASMC; and, (4) Cumberland performed its responsibilities under the surety bonds. Thus, Cumberland asserts that its "right to be equitably subrogated to the rights of the obligee (the ASMC) and to the rights of the principals (Laguna and Walker Land) and indemnitors (Chamblee, Black Creek, Jefferson Screening, and CAC) has now arisen and relates back to the entry of the suretyship relationship." (Doc. 17, p. 8).

Colonial initially asserts that the creditor here is the ASMC and not Laguna, Black Creek, and Jefferson Screening. (Doc. 20, p. 2). Therefore, it claims that Cumberland merely acquires the rights of the ASMC. It further claims that Cumberland's "only other option is to sue these entities on the contracts of indemnification that it had written with them (Laguna as a principal and Jefferson Screening and Black Creek as guarantors). . . ." (Doc. 20, p. 2, n.1). According to Colonial, "[n]either Jefferson Screening nor Black Creek is a party to the bonds and neither obtained a mining permit as a result of them. The Surface Mining Commission therefore does not have and never has had any rights against them or power over them based on the bonds. Cumberland Casualty has no claim against Jefferson Screening or Black Creek as subrogee of the Surface Mining Commission." (Doc. 20, p. 3). As to Laguna, Colonial asserts that Cumberland can only sue it for the money, and if it recovers, become a judgment creditor. (*Id.* at 3-4). However, it further asserts that Cumberland's rights are inferior to Colonial's because it (Colonial) has already taken action to execute its judgment and levy on the proceeds of the judgment against Seminole, which is demonstrated by the April 4, 2001 Walker County Circuit Court order and Colonial's subsequent service of garnishment on Seminole concerning Jefferson

Screening, Black Creek, and Laguna.  (Doc. 20, Ex. B).

Cumberland retorts that Jefferson Screening and Black Creek are parties to the

indemnification agreements, making them responsible for curing any defaults by the principals to

the bonds.  (Doc. 21, p. 2).  It also notes that the Chamblee defendants admit in their answer that

they were obligated under the agreements to Cumberland satisfying the obligations under the

bond for them.  (Doc. 21, p. 3).

Cumberland initially cites *Pearlman v. Reliance Insurance Company*, 371 U.S. 132, 83 S.

Ct. 232, 9 L. Ed. 2d. 190 (1962), in support of its position that it is entitled to equitable

subrogation.  Therein, the payment bond surety had been compelled to pay about $350,000.00 to

discharge all of the debts to laborers and materialmen of the insolvent contractor.  Because the

laborers and materialmen had been paid by the surety, the United States Supreme Court found

that the retained funds held by the government belonged to the surety.  The Supreme Court

followed the rule stated in *Henningsen v. United States Fidelity & Guaranty Company*, 208 U.S.

404, 28 S. Ct. 389, 52 L. Ed. 547 (1908), that when a payment bond surety fully pays the debts

owed to laborers and materialmen, the surety becomes subrogated to the contractor's, laborers',

and materialmen's rights in the retained fund.  Specifically, the Court stated:

> . . . the Government had a right to use the retained fund to pay laborers and
> materialmen; that the laborers and materialmen had a right to be paid out of the
> fund; that the contractor, had he completed his job and paid his laborers and
> materialmen, would have become entitled to the fund; and that the surety, having
> paid the laborers and materialmen, is entitled to the benefit of all these rights to
> the extent necessary to reimburse it. . . .

*Pearlman*, 371 U.S. at 141.  Following *Pearlman*, the Fifth Circuit has held:

> A different situation occurs when the surety completes the performance of
> a contract.  The surety is not only a subrogee of the contractor, and therefore a

13

creditor, but also a subrogee of the government and entitled to any rights the government has to the retained funds. [  ] If the contractor fails to complete the job, the government can apply the retained funds and any remaining progress money to costs of completing the job. The surety is liable under the performance bond for any damage incurred by the government in completing the job. On the other hand, the surety may undertake to complete the job itself. In so doing, it performs a benefit for the government, and has a right to the retained funds and remaining progress money to defray its costs. The surety who undertakes to complete the project is entitled to the funds in the hands of the government not as a creditor and subject to setoff, but as a subrogee having the same rights to the funds as the government. . . .

*Trinity Universal Ins. Co. v. United States*, 382 F.2d 317, 320 (5th Cir. 1967), *cert. denied*, 390

U.S. 906, 88 S. Ct. 820, 19 L. Ed. 2d 873 (1968) (footnotes omitted). *See also Balboa Ins. Co. v.*

*Bank of Boston Connecticut*, 702 F. Supp. 34, 37 (D. Conn. 1988) ("When a surety performs its

obligations under a performance and payment bond, it stands in the shoes of the contractor.

Thus, if the contractor has the right to the retained funds, the surety accedes to those rights when

it meets its obligations under the bonds."). The Alabama Supreme Court has also stated:

Suretyship is a three-party relationship among a principal, its surety, and the obligee to whom the principal and surety are jointly and severally bound for performance. *Balboa Insurance Co. v. United States,* 775 F.2d 1158, 1160 (Fed. Cir. 1985), citing *United States v. United States Fidelity & Guaranty Co.,* 236 U.S. 512, 35 S. Ct. 298, 59 L. Ed. 696 (1915). In *Maryland Casualty Co. v. Cunningham,* 234 Ala. 80, 83, 173 So. 506, 509 (1937), this Court said:

"[T]he salutary principle still prevails that the contract of suretyship is not that the obligee will see that the principal performs its conditions, but that the surety will see that he performs them (*Alabama Fidelity & Casualty Co. v. Alabama Fuel & Iron Co.,* 190 Ala. 397, 67 So. 318 (1914)). . . ."

In *Fidelity & Casualty Co. of New York v. Central Bank of Birmingham,* 409 So. 2d 788, 790 (Ala. 1982), this Court stated that "[t]he surety's right to equitable subrogation exists whether a surety steps in and physically completes the contract or whether it merely pays the laborers and materialmen under that contract."

*National American Ins. Co. v. Boh Bros. Const. Co., Inc.*, 700 So. 2d 1363, 1366 (Ala. 1997).

14

Subrogation rights "arise by operation of law rather than by contract." *Fidelity & Cas. Co. of New York*, 409 So. 2d at 790; *accord First Alabama Bank of Birmingham v. Hartford Accident & Indemnity Company, Inc.*, 430 F. Supp. 907, 910 (N.D. Ala. 1977). In a similar vein, State law provides that the surety who pays his principal's debt is put in the place of the creditor. *See* ALA. CODE §§ 8-3-2 & 11.

> The Bankruptcy Court for the Middle District of Florida recently stated as follows:

> The scope of a surety's right of equitable subrogation in Florida was explained by the Supreme Court of Florida[:]

>> But the surety in cases like this undertakes duties which entitle it to step into three sets of shoes. When, on default of the contractor, it pays all the bills of the job to date and completes the job, it stands in the shoes of the contractor insofar as there are receivables due it; in the shoes of laborers and material men who have been paid by the surety--who may have had liens; and, not least, in the shoes of the government, for whom the job was completed.

> *Transamerica Insurance Company v. Barnett Bank of Marion County, N.A.*, 540 So. 2d 113, 115-16 (Fla. 1989). In *Transamerica,* the Florida Supreme Court found that a surety's right of equitable subrogation with respect to unpaid contract amounts was entitled to priority over the claims of the bank that financed the project, to the extent of the surety's performance. *Transamerica,* 540 So. 2d at 117.

*In re Cone Constructors, Inc.*, 265 B.R. 302, 306 (Bkrtcy. M.D. Fla. 2001).

This court agrees with the plaintiff and finds under the foregoing authorities that, when it performed on behalf of Laguna and Walker Land, Cumberland was equitably subrogated to certain benefits due those entities, as well as the ASMC. It is undisputed that Cumberland acted and fulfilled its obligations under the bonds by entering into a settlement agreement with the ASMC and thereafter incurred expenses as a consequence of those responsibilities. Colonial's

15

assertion that Cumberland only acquires the rights of ASMC as a creditor is not supported in the record or law. *See Fidelity & Deposit Co. of Md. v. Scott Bros. Const. Co.*, 461 F.2d 640, 642 (5th Cir. 1972) ("a surety 'is not only a subrogee of the contractor, . . . but also a subrogee of the [owner] and entitled to any rights the [owner] has to the retained funds.' *Trinity Universal [Ins. Co. v. United States]*, 382 F.2d [317,] 320 [(5th Cir. 1967)]"); *Fidelity and Casualty Company of New York*, 409 So. 2d at 790-91 (surety entitled to contract funds that were due the principal from the obligee once it (the surety) performed its obligations). Under the facts and circumstances, this court finds that Cumberland was equitably subrogated not only as to the ASMC but also as to Laguna and Walker Land.

The next question concerns the scope of Cumberland's rights under a theory of equitable subrogation. Cumberland asserts that it is entitled to priority over Colonial with respect "to all of the proceeds from the Seminole litigation not to exceed the amount required to reimburse Cumberland for the costs it incurred or will incur pursuant to its obligations under the surety bonds plus costs, attorneys' fees, and expenses." (Doc. 17 at 17; Doc. 29 at 2). It makes this claim premised on the fact that the third-party action against Seminole and the proceeds therefrom are "related to the obligations that Cumberland fulfilled on behalf of the Chamblee defendants." (Doc. 26 at 12). More specifically, Cumberland asserts that "because Laguna, Black Creek, and Jefferson Screening's rights in the Seminole Litigation are inextricably connected to the reclamation obligations preformed by Cumberland, *see* 83 C.J.S. *Subrogation* § 60; *American Ins. Co.*, 577 N.E.2d at 759, Cumberland is subrogated to those rights to the extent necessary to reimburse Cumberland for its performance of those obligations, *see* 83 C.J.S. *Subrogation* § 60.[ ] Equitable subrogation entitles Cumberland to step into the shoes of Laguna,

16

Black Creek, and Jefferson Screening with respect to their right to recover judgment proceeds in the Seminole litigation." (Doc. 26 at 15) (footnote omitted).  Cumberland further states that allowing equitable subrogation to extend to the Seminole proceeds will preclude unjust enrichment on the part of Laguna, Black Creek, and Jefferson Screening.  (*Id.* at 15-16).

Colonial counters that Cumberland is improperly attempting "through equitable subrogation, to reach into a separate tort judgment obtained, in part at least, by entities not even parties to the bond, obtain priority over Colonial's judgment against these parties, and nullify a state court's order charging that the proceeds of any recovery be paid first to Colonial." (Doc. 28 at 2) (footnote omitted).  It cites to *Transamerica Ins. Co.*, 540 So. 2d 113; *USF&G v. Leach*, 438 F. Supp. 295 (M.D. Ga. 1977); *Aetna Cas. & Surety Co. v. J.F. Burnken & Son, Inc.*, 357 F. Supp. 290 (D.S.D. 1973); *Travelers Indemnity Co. v. Clark*, 254 So. 2d 741 (Miss. 1971).

Cumberland retorts that Colonial does not "dispute that the subject matter of the Seminole Litigation is inextricably related to the reclamation obligations that Cumberland relieved on behalf of Laguna, Black Creek, and Jefferson Screening.  Nor does Colonial dispute that any equitable subrogation right to the proceeds of the judgment in the Seminole Litigation would be superior to Colonial's asserted interest.  Instead, Colonial argues that Cumberland has cited 'no law' which 'suggests that equitable subrogation can be used in [the manner explained by Cumberland],' and insists that a surety may only be subrogated to 'rights in the contract [that] it bonded.'" (Doc. 29 at 3 (citing doc. 28 at 2)).  Cumberland further states that Colonial's argument is merely an attempt to unduly restrict the application of equitable subrogation. Instead, Cumberland asserts, "a surety may be subrogated to the rights of the original creditor (or principal) . . . [but] that is *not* the outer limits of a surety's right to subrogation." (Doc. 29 at 3).

17

As noted previously, numerous cases are cited by the parties for various propositions. However, none are factually or legally apposite. In support of its contention that it is well-established that a surety is subrogated to a principal's rights against third parties that are connected with the obligation that the surety is satisfied on behalf of the principal, Cumberland cites to and discusses *American Liberty Insurance Co. v. AmSouth Bank*, 2002 Ala. LEXIS 21 at *13 (Ala.), *American Insurance Company v. Ohio Bureau of Workers' Compensation*, 577 N.E.2d 756, 759 (Ohio App. 1991), and *Fidelity & Casualty Co. of New York v. Central Bank*, 409 So. 2d 788, 790 (Ala. 1982). It further cites to *St. Paul Fire and Marine Ins. Co. v. United States,* 370 F.2d 870 (5th Cir. 1967); *Travelers Indem. Co. v. Evans Pipe Co.*, 432 F.2d 211 (6th Cir. 1970); *Argonaut Ins Co. v. Commercial Standard Ins. Co.*, 380 So. 2d 1066, 1067 (Fla. 1980); *Menorah Nursing Home, Inc. v. Zukov*, 548 N.Y.S.2d 702 (N.Y. 1989); and *Maryland Casualty Co. v. King*, 381 P.2d 153, 157-58 (Okla. 1963). (Doc. 29 at 4-6).

In *American Liberty Insurance v. AmSouth Bank*, a conservator misappropriated funds from a personal injury settlement intended for an individual for whom he was appointed as guardian ad litem. The surety paid the loss caused by the conservator to the probate court after entry of a judgment finding the surety liable for the misappropriated funds was entered. Thereafter, the insurer filed a motion seeking relief from the judgment, asserting that it was entitled to the same because the misappropriation occurred before the conservator was appointed. The motion was denied. The insurer ultimately brought an action against the bank claiming that "it (the insurer) was subrogated to, and was the equitable assignee of, all rights and claims of the defrauded estate by virtue of [its] payment as surety for [the conservator]" and, therefore, entitled to bring the action. *American Liberty Insurance*, 2002 Ala. LEXIS 21 at *5. The bank's motion

18

for summary judgment was granted.  The surety appealed.  On appeal, the bank asserted that the surety's claims against it were limited to those that could be brought by the conservator. Rejecting this argument, the Alabama Supreme Court stated, in part, "Alabama has long recognized that a surety who pays the debt of his principal 'stands in the shoes' of the payee and may enforce the payees' rights in order to seek reimbursement." *Id.* at 8, (citing, *Lloyd Wood Const. Co. v. Con-Serv, Inc.*, 285 Ala. 409, 414, 232 So. 2d 649, 654 (1970).  The court held "that the alleged conversion of the check by AmSouth is certainly related to the underlying debt; indeed, it was through this check that the misappropriated funds came to be available to [the conservator] in the first place.  Therefore, we hold that [the insurer] is subrogated to all of the rights and remedies of the . . . estate against not only [the conservator], but also against AmSouth for conversion of the check." *Id.* at 14.

*American Liberty Insurance* is distinguishable because the surety is acting on a right and remedy possessed by the payee which it (the surety) acquired by payment of the debt owed as a consequence of the surety's actions.  In the present case, the payee (ASMC) did not possess the rights and remedies that were advanced in the Seminole litigation.[6]  Additionally, in that action, unlike the present matter, the surety brought the lawsuit against the third party.

In *American Insurance Company v. Ohio Bureau Workers' Compensation*, a surety for a self-insured employer was subrogated to the rights of the employer against the excess indemnity carrier when it satisfied the employer's obligations on the workers' compensation bond that it

_____

[6] Although this distinction may not appear to be significant, it is under Alabama law.  The court in *American Liberty Insurance* noted that the applicable state laws "transfer to a surety all of the rights and remedies of the creditor that are even incidentally related to the underlying debt.  In other words, if a creditor had a right or remedy that is in some concrete way related to the transactions surrounding the underlying debt, which the creditor might have pursued in order to seek reimbursement of indebted funds that are not recovered, a surety that pays the underlying debt would be allowed to pursue that right or remedy to seek reimbursement." *American Liberty Insurance*, at *9-10 (referencing and citing ALA. CODE 1975 §§ 8-3-2 & 11).

19

issued.  After discussing hornbook law on equitable subrogation, the court stated, "Ultimately,

the doctrine will be invoked where necessary to prevent injustice."  *Id.*, 577 N.E.2d at 759.  The

court went on to state:

> Our research has revealed two classes of cases where courts have
> consistently held that a surety is subrogated to the rights of its principal, as well as
> the obligee.  In construction cases where the surety completes performance for the
> defaulting principal under the contract, the surety will be subrogated to the
> principal's right to payment by the owner upon completion of the project.
> *Travelers Indemnity Co. v. Peacock Construction Co.* (C.A.5 1970), 423 F.2d
> 1153; *Travelers Indemnity Co. v. First Natl. State Bank of New Jersey* (N.J.
> 1971), 328 F. Supp. 208; *Equilease Corp. v. United States Fidelity & Guaranty
> Co.* (1978), 262 Ark. 689, 565 S.W.2d 125; *United States Fidelity & Guaranty
> Co. v. First State Bank of Salina* (1972), 208 Kan. 738, 494 P.2d 1149.

> Similarly, where the surety is called to answer for the principal's default,
> the surety is subrogated to the principal's rights against others who by their
> negligence, breach of contract or breach of warranty contributed to that default.
> *Travelers Indemnity Co. v. Evans Pipe Co.* (C.A.6 1970), 432 F.2d 211; *United
> States Fidelity & Guaranty Co. v. North American Steel Corp.* (Fla. App. 1976),
> 335 So. 2d 18; *Menorah Nursing Home, Inc. v. Zukov* (1989), 153 A.D.2d 13, 548
> N.Y. Supp. 2d 702;[ ] *Maryland Casualty Co. v. King* (Okl. 1963), 381 P.2d 153.

> . . . .

> We think the proper rule is that, when equitable, a surety is subrogated not
> only to the rights of the obligee, but also to the rights and remedies of the
> principal against third parties, where those rights arise from or are closely related
> to the debt the surety is called to pay under the suretyship agreement.  As equity is
> served and unjust enrichment avoided, this rule is entirely consistent with the
> well-established law of subrogation.  If Wilson Freight had paid its debt to the
> Industrial Commission, Transport's policy would have required it to indemnify
> Wilson Freight.  We see no reason why Transport should be absolved of its
> contractual obligation simply because a surety steps in and discharges Wilson
> Freight's obligation to the Industrial Commission.  Once the obligation of its
> principal is completely discharged, American steps into the shoes of its principal,
> Wilson Freight, and is entitled to exercise any rights arising from the debt paid,
> specifically the right to indemnification under Transport's policy of excess
> indemnity insurance.

*American Insurance Company*, 577 N.E.2d at 759.

The *American Insurance Company* case is distinguishable from the present case for a number of reasons. First, the surety brought the action against the nonpaying third-party that had contracted with the principal to provide excess indemnity coverage. Second, the court specifically stated that it could "see no reason why [the third-party] should be absolved of its contractual obligation simply because a surety steps in and discharges [the principal's] obligation. . . ." *American Ins.*, 577 N.E.2d at 925. The above quotation shows that the court was troubled by the third party's attempt to renege on its contractual obligation. In the present case, Seminole will not be permitted to renege on its contractual obligations. It will have to pay the Walker County judgment to Colonial, with the remainder to the other creditors of the Chamblee defendants to the extent the funds are available and owing.

In the *Fidelity & Casualty Company of New York v. Central Bank* case, the surety satisfied its bond obligations on behalf of a subcontractor and sought a priority in certain funds paid to settle a dispute with the general contractor. Competing for priority was a bank with a perfected security interest in the inventory, accounts receivable, and contract rights of the subcontractor. The trial court ruled that the bank had the superior claim to the settlement funds. The Alabama Supreme Court reversed the trial court, stating that the surety was equitably subrogated to the subcontractor's claim against the general contractor for funds that were due on the original construction contract, thus defeating the bank's "first in time, first in line" claim. *Id.*, 409 So. 2d at 790-91.

*Fidelity* is distinguishable from the present case in that it involved a claim to recover contract funds that were not paid to the subcontractor under the related construction contract, not a distinct tort action. Additionally, in that case, the surety (and the bank) intervened in the action brought by the subcontractor against the general contractor. In the present action,

21

Cumberland did not intervene in the pending state action.

Cumberland correctly cites *St. Paul Fire & Marine Ins.* for the proposition that where the surety satisfies the debtor's import duties pursuant to a bond, it is subrogated to the rights and remedies of the creditor (the United States Government) and the principal/debtor, permitting its maintenance of a third-party action against a surviving partner of the company that did not pay the duties. *Id.*, 370 F.2d at 872-73. It also cites *Travelers Indemnity Co.* for the proposition that the surety who satisfied a golf course builder's obligation to a golf course owner when defective irrigation piping was installed, properly was subrogated to the rights of the builder in a third-party claim against the maker of defective irrigation piping. *Id.*, 432 F.2d at 212. Therein, the court stated that the surety "was subrogated not only to the rights of its principal ([the builder]) but also to the rights of its obligee (Country Club)." *Id.* In *Argonaut Ins. Co.*, the court held that the surety could bring an action on a subcontractor's bond when the subcontractor "was either unable or refused to complete its subcontract work." *Id.*, 380 So. 2d at 1066. In *Mehorah*, the court permitted the surety to maintain an action against the subcontractor whose wrongful conduct allegedly caused a default that resulted in the surety having to fulfill the obligations of the general contractor who failed to perform. The court stated, "It seems only equitable to permit [the surety], which is potentially liable to the plaintiffs as a result of the principal's default, to seek indemnification from the third-party defendants whose misconduct allegedly caused the default. Thus, [the surety] is a contingent subrogee not only of the plaintiffs, but also of its principal [(the general contractor)]." *Id.*, 548 N.Y.S.2d at 706. Lastly, in *Maryland Casualty*, the court held that the surety could maintain a breach of warranty action against the supplier of purportedly deficient concrete which had been used by its principal in a project for the obligee.

22

*Id.*, 381 P.2d at 155-58.

The foregoing cases, however, are not particularly helpful.  The parties do not dispute the concept of equitable subrogation.  Instead, they disagree over its application in the present circumstances.  Colonial asserts that no court has approved a priority of a surety in the "general assets of a principal, much less indemnitors."[7]  (Doc. 28 at 2).  Cumberland disagrees and states that the foregoing authorities support its position that it is due to be subrogated to the rights of the Chamblee entities and that its rights are superior to those of Colonial.

A number of points are evident.  First, if Laguna, Walker Land, and Jefferson Screening did not initiate the action against Seminole, Cumberland could have done so under the circumstances.  Second, Cumberland could have intervened in the Seminole litigation to protect its interests.  Third, Cumberland has an enforceable judgment from this court against the Chamblee defendants.  Fourth, absent an order from this court, Cumberland's judgment obtained in the prior federal litigation  (Case No. "00-3574") does not have a preference over the judgment of Colonial in the Seminole action.

Were this a typical case wherein the surety was seeking a declaration that it had a priority to contract funds due the principals, Laguna or Walker Land, the issue would be easily settled with Cumberland having a priority or preference.  That is not the case, however.  Cumberland is seeking a priority in the proceeds of a tort action by Laguna, Walker Land, and Jefferson Screening in which Colonial has a perfected security interest.  Although the proceeds from the Seminole litigation are related to the mining operations undertaken by the Chamblee

---

[7] In support of this argument, Colonial states, "Indeed, the few courts invited to extend the doctrine of equitable subrogation beyond the immediate contract have flatly rejected the invitation."  (Doc. 28 at 3, *citing Transamerica,* 540 So. 2d at 117, *USF&G v. Leach,* 438 F. Supp. 295, 298 (M.D. Ga. 1977), *Aetna Casualty,* 357 F. Supp. at 293-94, and *Travelers Indemnity,* 254 So. 2d 741, 747 (Miss. 1971).

defendants, that is not enough for this court to give Cumberland a preference over Colonial.  No case relied upon by Cumberland is sufficient to warrant such a broad application of equitable subrogation.  Absent such precedent, the undersigned must find against Cumberland.

Cumberland cites *Pearlman* for the proposition that "equitable principles hold that a surety who steps forward and assumes the obligations of the principals and indemnitors under a bond should be subrogated to the recovery of all entities for whom it has acted and to who it has satisfied obligations." (Doc. 21 at 4).  The court finds that this is an overstatement of the holding in *Pearlman*.  That case involved the surety's right to "retained funds" on a government contract after it paid the principal's laborers and materialmen.  *Pearlman*, 371 U.S. at 141-242.  It did not involve tort proceeds obtained as a result of a lawsuit.

To the extent that Colonial asserts that its claim is superior to Cumberland's because it took affirmative steps to protect its rights, including (1) the filing of a UCC-1 on January 13, 1999, (2) obtaining an order from the Circuit Court of Walker County on April 4, 2001, (3) directing that any judgment in favor of Laguna against Seminole be paid into that court and then to Colonial, and (4) issuing a writ of garnishment against Seminole, which directed that Seminole must pay any proceeds to Colonial, the court agrees because Cumberland is not entitled to equitable subrogation of these proceeds.  In *Transamerica*, the court stated the usual rule:

> the overwhelming and essentially unanimous post-U.C.C. decisions in this country, federal as well as state courts, have held that (1) the surety's equitable right of subrogation is not a consensual security interest, (2) no U.C.C. filing is necessary to perfect the surety's interest, and (3) the surety's interest continues to be, as it was under pre-Code law, superior to the claim of a contract assignee, such as a bank.

*Transamerica,* 524 So. 2d at 449-50 (citing *National Shawmutt Bank v. New*

*Amsterdam Casualty Co.,* 411 F.2d 843 (1st Cir. 1969); *In re J.V. Gleason Co.,* 452 F.2d 1219 (8th Cir. 1971); *Home Indem. Co. v. United States,* 193 Ct. Cl. 266, 433 F.2d 764 (1970); *First Alabama Bank v. Hartford Accident & Indem. Co.,* 430 F. Supp. 907 (N.D. Ala. 1977); *Third Nat'l Bank v. Highlands Ins. Co.,* 603 S.W.2d 730 (Tenn. 1980); *Alaska State Bank v. General Ins. Co.,* 579 P.2d 1362 (Alaska 1978); *Argonaut Ins. Co. v. C & S Bank,* 140 Ga. App. 807, 232 S.E.2d 135 (1976); *Financial Co. of America v. United States Fidelity & Guar. Co.,* 277 Md. 177, 353 A.2d 249 (1976); *Canter v. Schlager,* 358 Mass. 789, 267 N.E.2d 492 (1971); *United States Fidelity & Guar. Co. v. First State Bank,* 208 Kan. 738, 494 P.2d 1149 (1972); *Travelers Indem. Co. v. Clark,* 254 So. 2d 741 (Miss. 1971); *Jacobs v. Northeastern Corp.,* 416 Pa. 417, 206 A.2d 49 (1965); White & Summers, Uniform Commercial Code § 22-5 (2d ed. 1980)).

*Transamerica Ins. Co.*, 540 So. 2d at 117. However, because the court finds that equitable subrogation is not applicable, Cumberland's claim is not superior to Colonial's.

To the extent that Colonial asserts a "first in time, first in line" entitlement because it filed a UCC-1 and took affirmative steps in the Walker County litigation to protect any claim it might have had, the court finds that this is sufficient under the circumstances. Again, if equitable subrogation were applicable, Cumberland would have a priority because the UCC protects contract rights and it is not necessary for a surety to file a financial statement under the UCC to protect its right to equitable subrogation. *First Alabama Bank of Birmingham*, 430 F. Supp. at 910; *see also Transamerica*, 540 So. 2d at 117. Absent equitable subrogation, there is no "relation back," entitling Cumberland to a preference over Colonial.

## V. CONCLUSION

Premised on the foregoing, the court finds that Cumberland's motion for summary judgment is due to denied.

**DONE** this the _____ day of August, 2002.

_____
**JOHN E. OTT**
United States Magistrate Judge